**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| OSCAR FLORES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10-cv-06026 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| RONALD LACKAGE, DAVID | ) | |
| FLEMING, and | ) | |
| the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

December 2008 was a colder-than-normal month in Chicago.[1] December 22 was frigid: the high was 7°F, the low was -4°F, and 4 inches of snow sat on the ground. So conditions were ripe for a dispute between neighbors over calling "dibs" on a parking spot. Some Chicagoans believe that city tradition (or perhaps a Lockean view of the right to the fruits of one's labor) allows them to place a chair, or some other placeholder, in an on-street parking spot that they've freshly shoveled, thereby calling "dibs" and saving the space for themselves. John Kass, *Snowstorm's Charm Can't Stand up to Law of Street*, CHICAGO TRIBUNE at 3 (Jan. 5, 1999); John Kass, *A Winter Etiquette Lesson: No Dibs Until It Gets Deep*, CHICAGO TRIBUNE at 2 (Dec. 20, 2012). Others refuse to take this sitting down. *See* http://www.chairfreechicago.org.

---

[1]Climate data available at http://www.ncdc.noaa.gov/cdo-web, query for Chicago O'Hare weather station for December 2008.

Based on facts that snowballed from a "dibs" dispute, Plaintiff Oscar Flores brings a lawsuit against Chicago Police Officers Ronald Lackage and David Fleming,[2] and against the City of Chicago, alleging civil rights violations pursuant to 42 U.S.C. § 1983.[3] In his complaint, Flores alleges that Lackage and Fleming illegally entered his apartment to arrest him on December 22, 2008, using excessive force against him during the arrest and afterwards. R. 1, Compl.[4] Flores also brings a claim against the City of Chicago for depriving him of adequate accommodations for sleep in his overnight lockup cell. *Id.* Flores has moved for partial summary judgment on the warrantless entry and excessive force claims [R. 64], and Chicago has moved for partial summary judgment on the unconstitutional conditions of detention claim [R. 68]. For the reasons set forth below, Flores's motion is granted as to the warrantless entry claim but denied as to the excessive force claim, and Chicago's motion is granted.

## I. Background

In deciding these summary judgment motions, the Court views the evidence in the light most favorable to the non-movant, and in this case, that lens will flip back-

---

[2]The complaint named "Unknown Officer 1," but even after discovery, Flores has not moved to name a specific additional officer, so the Clerk's Office is instructed to terminate "Unknown Officer 1" as a defendant.

[3]This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

[4]Citation to the docket is "R." followed by the docket entry. Citations to the parties' Local Rule 56.1 Statements of Fact are R. 65 (for Flores's Statement of Facts), R. 75 (for Defendants' Response to Flores's Statement and Defendants' Additional Facts), R. 77 (for Flores's Response to Defendants' Additional Facts), R. 69 (for Defendants' Statement of Facts), R. 72 (for Flores's Response to Defendants' Statement and Flores's Additional Facts), and R. 80 (for Defendants' Response to Flores's Additional Facts), followed by the paragraph number.

and-forth because both sides have moved for summary judgment on various claims. Oscar Flores lived in the ground floor apartment at 1827 North Kedvale Avenue in Chicago. R. 65 ¶ 1. On December 22, 2008, Flores shoveled snow to clear a parking space on the street in front of his home. *Id.* ¶ 7. That evening, Flores's wife put a chair in that space (thereby calling "dibs" on it) and then drove her car away. *Id.* ¶ 8. Flores's neighbor, Glenda Burgos, moved the chair and parked in the spot that Flores had shoveled. *Id.* ¶ 9. This started an argument. Flores came out of his apartment and asked Burgos why she had moved the chair and parked in the spot he had cleared. *Id.* ¶ 10. At her deposition, Burgos testified that Flores "came up to [her] very aggressive[ly]," "putting the chest out and the arm . . . up," and threatened to "fuck up [her] car." R. 75-1, Defs.' Exh. A, Burgos Dep. 14:17-18, 17:2-3, 86:20-21. Because she was afraid for the safety of her car, she called 911. *Id.* 46:4-9.

Officers Lackage and Fleming responded to the call and arrived at the scene between 8:00 and 9:00 p.m. R. 69 ¶ 6. When they arrived, Burgos pointed out where Flores lived. R. 65 ¶ 14. After Burgos recounted the incident to the officers, Fleming suggested that they try to take care of this civilly without incident. R. 69-1, Defs.' Exh. A, Fleming Dep. 15:20-24. After she agreed, Fleming and Lackage knocked on Flores's outer door. Fleming Dep. 17:5-7; R. 69-2, Defs.' Exh. B, Lackage Dep. 16:21-22. Flores answered the knock by opening the door, but he stayed entirely on the inside of the doorway. Fleming Dep. 18:12-15, 19:5-7; Lackage Dep. 16:23-24.

The parties dispute what happened next. According to the officers, Lackage explained to Flores that Flores could not leave objects in the street to hold a parking

spot. Fleming Dep. 19:13-16; Lackage Dep. 17:3-6. Flores responded,"Fuck you."
Fleming Dep. 19:20; Lackage Dep. 17:6. Burgos heard something similar from where
she stood (which was around 25-30 feet away): Flores shouted at the police aggressively
and swore at them. Fleming Dep. 17:19-18:1; Burgos Dep. 26:1-27:20. At that point,
Fleming went back to Burgos and asked her if she would like to pursue criminal
charges; she said yes. Fleming Dep. 20:10-15; Burgos Dep. 28:4-14. Fleming returned
to where Lackage was waiting with Flores, announced that Flores was under arrest,
took handcuffs out, and reached through the open outer doorway to grab one of Flores's
hands. Fleming Dep. 21:11-20, 22:13-17; Lackage Dep. 19:24-20:4. Flores swung his
arms away to avoid the handcuffs and ran, through an inner door, back into his
apartment. Fleming Dep. 22:18-24, 25:7-10; Lackage Dep. 21:3-7. Lackage tried to stop
him by grabbing his right arm and his shirt, but Flores ducked down and slid out of his
shirt. Lackage Dep. 20:6-19. The officers then pursued Flores into his living room.
Fleming Dep. 26:1-13; Lackage Dep. 21:8-10.

In the living room, (this is all still according to the officers) Fleming and Lackage
attempted an "emergency takedown" of Flores by grabbing his arms to take him to the
ground. Fleming Dep. 26:15-22, Lackage Dep. 21:11-16, 23:13-15. Flores began
throwing elbows, knocking Fleming to the floor and injuring Fleming's wrist. Fleming
Dep. 27:5-20; Lackage Dep. 23:14-22. Seeing this, Lackage seized Flores from behind
and took him down onto the living room couch, with Flores face down against the
cushion and Lackage on top. Fleming Dep. 28:15-29:14; Lackage Dep. 24:5-9. After
Flores continued to struggle, Lackage took out his pepper spray and warned Flores to

stop resisting. Fleming Dep. 31:11-15; Lackage Dep. 24:20-23, 25:9-19. Lackage then sprayed Flores (and inadvertently also sprayed himself). Fleming Dep. 32:6-9; Lackage Dep. 25:20-22. At that point, Fleming arrived at the couch and tried to control Flores's arms with wrist locks and arm bars. Fleming Dep. 32:16-18. Meanwhile, to stop Flores from elbowing, Lackage began striking Flores with "open hand stuns" on his back or backside. Lackage Dep. 26:8-10; Fleming Dep. 33:21-34:4. Flores finally stopped struggling, and the officers scooped his arms out and handcuffed him. Fleming Dep. 33:8-17; Lackage Dep. 26:12-19.

According to Fleming and Lackage, Flores continued to make things difficult, even after being handcuffed. As the officers left the apartment with Flores, Flores turned his feet outward to resist being taken out, so Fleming and Lackage had to pick Flores up a little and carry him through the door. Fleming Dep. 39:13-19, Lackage Dep. 29:2-7, 19-23. On the way to the police car, Flores tried to pull away, and Flores and Fleming slipped on the icy sidewalk, falling into the snow—Flores face down, with Fleming on top. Fleming Dep. 40:8-12, 18-22; Lackage Dep. 31:4-9. The officers then put Flores into their car and drove him to the 25th District police station. Fleming Dep. 43:5-6; Lackage Dep. 34:4-10.

Flores tells a different story. Very different. According to Flores, when he answered the knock on the outer door, the officers were the ones who were aggressive; they told him it was illegal to place a chair in the parking space and called him a "motherfucker." R. 69-3, Defs.' Exh. C, Flores Dep. 41:7-24. Then one officer, without ever telling him that he was under arrest, pulled out handcuffs and grabbed Flores to

5

pull him outside, ripping his shirt. *Id.* 42:1-7, 43:5-7, 9-16. Flores pulled away and ran farther back into his apartment, but the police chased him into his living room, beating him and knocking him down onto the couch. *Id.* 45:5-14, 46:5-7, 11-13. Flores denies throwing elbows; he asserts he was simply covering his face to protect himself from the beating. *Id.* 45:24-46:6. He also denies knocking one of the officers to the floor. *Id.* 47:16-18, 47:23-48:1. Instead, Flores says, the officers held him down on the couch and continued to beat him even after he was handcuffed. *Id.* 47:13-15, 48:7-10. And when Lackage and Fleming took him outside, they knocked him down to the snow and continued to hit him, not stopping until other police officers arrived and he was taken to the police station. *Id.* 49:14-15, 50:17-19, 55:20-22. Finally, Flores alleges that the officers sprayed him with pepper spray twice—once before they handcuffed him in his living room and once after knocking him onto the snow. *Id.* 49:16-50:3.

After Flores arrived at the 25th District station, he was placed in the station's lockup. R. 69 ¶ 7. In his lockup cell was a piece of concrete—Chicago labels the concrete a "bed," Flores calls it a "slab"—about two feet tall and four feet long. R. 72 ¶¶ 8-9. Flores spent about 30 minutes in his cell before he was taken to the upstairs area of the station. R. 69 ¶ 10. There, he spent about two hours meeting with detectives. *Id.* ¶¶ 13-14. After meeting with the detectives, Flores went back to the lockup, where he was fingerprinted, photographed, and allowed to make a phone call. *Id.* ¶¶ 15-16. He was then placed back into his lockup cell for the night. *Id.* ¶ 16.

Although it is undisputed that Flores did not sleep in his cell that night, the parties dispute whether Flores tried to sleep. All agree that Flores was not given a

6

mattress or any other bedding such as a blanket, linens, foam pad, or pillow, but Chicago contends that he never asked for bedding or a mattress. R. 80 ¶ 7. Chicago also asserts that Flores testified in his deposition that he did not even try to sleep. *See* R. 80 ¶ 8; Flores Dep. 71:13-17. But Flores filed an affidavit after his deposition where he avers that he was "unable to sleep . . . [t]he concrete slab was uncomfortable because it was too short and the surface was too hard especially due to the injuries that I suffered during the arrest." R. 72-2, Pl.'s Exh. 1, 5/17/12 Flores Aff. ¶ 11. He also avers that he was extremely tired and in physical pain the next day "from the injuries inflicted during [his] arrest, spending the night on a rock hard surface and being unable to sleep." *Id.* ¶ 12. The next morning, Flores was taken to Cook County Jail, and then to an immigration detention facility in DuPage County. Flores Dep. 83:11-13, 86:8-16. He was finally released on December 31, 2008. *Id.* 87:1-4. Although Burgos signed a misdemeanor assault complaint against Flores, the assault charge was ultimately dismissed.[5] R. 65 ¶¶ 66-67.

Following this incident, Flores filed a seven-count complaint for constitutional violations (and state-law torts) allegedly committed by Defendants, including false arrest, use of excessive force, and deprivation of adequate accommodations for sleep. Compl. at 5-11. Flores has moved for partial summary judgment on Counts One and Two [R. 64], and Chicago has moved for partial summary judgment on Count Three [R. 68].

---

[5]Although Flores was also charged with felony resisting/obstructing a peace officer, R. 77 ¶ 22, the disposition of that charge is unclear.

7

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Centr., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

## III. Analysis

### A. Warrantless Entry and Arrest

Flores first alleges that Officers Lackage and Fleming violated the Fourth Amendment by entering his home to arrest him without a warrant, consent, or exigent circumstances. R. 66, Pl.'s Br. at 1. In response, Lackage and Fleming construe Flores's claim as a claim for false arrest and contend that they had probable cause to arrest him. Additionally, Defendants argue that Flores did not have a reasonable expectation of privacy because he was outside his home when the arrest began. Finally, Defendants claim qualified immunity. R. 74, Defs.' Resp. at 1-2.

It is true that Count One in Flores's Complaint is a claim for false arrest rather than for warrantless entry. Compl. at 5. But a complaint need not plead specific legal theories; it need only plead facts that would provide the plaintiff with a right to

8

recover, no matter the legal theory. *Williams v. Seniff*, 342 F.3d 774, 792 (7th Cir. 2003). And it is clear from Flores's brief that he moves for summary judgment on Count One based on a claim of warrantless entry. Pl.'s Br. at 2. So the failure of Count One to specifically plead "warrantless entry" does not prevent Flores from asserting it now.

Under the law governing the warrantless entries of police into homes, even if Lackage and Fleming had probable cause to arrest Flores, they still are not allowed to enter his home without an arrest warrant unless they had his consent or unless exigent circumstances supported the entry. *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001). The parties all agree that Lackage and Fleming did not have an arrest warrant. R. 75 ¶ 20. And although Defendants dispute that they needed Flores's consent to arrest him (instead, they believe Flores was outside his home when the arrest began), they concede that Flores did not consent to the entry. R. 75 ¶¶ 46-47. So the remaining questions are (1) whether, under the Fourth Amendment, Flores had a reasonable expectation of privacy in the area he was standing in when the arrest began, (2) whether Lackage and Fleming had exigent circumstances to enter Flores's home, and (3) whether Lackage and Fleming are entitled to qualified immunity.

### 1. Reasonable Expectation of Privacy

The Fourth Amendment protects a person's reasonable expectation of privacy in various settings, but chief among these is protection against the physical entry of the home. *Payton v. New York*, 445 U.S. 573, 585-86 (1980) (citation omitted). Occupants inside their homes enjoy an especially heightened Fourth Amendment

protection. *Id.* at 586 ("[S]earches and seizures inside a home without a warrant are presumptively unreasonable."); *see also id.* at 590 ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.").

But even though entry into the home without a warrant "by even a fraction of an inch" is too much, "exactly where [the] outside ends and where the home begins is not a point immediately obvious." *Sparing*, 266 F.3d at 689 (quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001)) (internal quotation marks omitted). Officer Fleming testified that Flores was standing "inside the door" right before Fleming reached through the doorway threshold. Fleming Dep. 21:4-5, 22:13-17. He characterized the area where Flores was standing as a "little hallway" between the outer door (facing the street) and the inner door (leading to Flores's living room). *Id.* 24:2-4. Defendants therefore contend that the outer boundary of Flores's home was the inner door, not the outer door, meaning that Flores was supposedly standing *outside* his home when the arrest began. *See* R. 75 ¶ 21. For his part, Flores calls that area in between the outer door and the inner door a "small little room" about "six [feet] by three [feet]" in size, thus considering himself *inside* his apartment during the arrest. Flores Dep. 147:14-16, 150:9-10. As explained below, the Court must look past the parties' nomenclature because the Fourth Amendment is not strictly controlled by the common law of property, at least when it comes to doorway arrests. *United States v. Santana*, 427 U.S. 38, 42 (1976). Instead, to have been in his home (for Fourth Amendment purposes)

10

when he stood in the space between the outer door and the inner door, Flores must have held a reasonable expectation of privacy in that space. *Id.*

The test for a reasonable expectation of privacy has two required elements, one subjective (that is, dependent on what the plaintiff thinks) and one objective (that is, dependent on society's view). "A reasonable expectation of privacy exists when (1) the [plaintiff] exhibits an actual (subjective) expectation of privacy and, (2) the expectation is one that society is prepared to recognize as reasonable." *United States v. Ruth*, 65 F.3d 599, 604 (7th Cir. 1995) (internal quotation marks and citation omitted). In determining whether a person held an actual expectation of privacy, courts often evaluate the person's efforts to secure and keep private the location where the seizure took place. *See United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007). Thus, in *United States v. Villegas*, a resident in an apartment building did not have an actual expectation of privacy in a common hallway because the outer doors leading to the hallway were left open, exposing the activities in the hallway to the world. 495 F.3d 761, 767 (7th Cir. 2007). But in *United States v. Werra*, a resident in a multi-tenant house who rented the entire third floor had an actual expectation of privacy in a foyer on the ground floor. 638 F.3d 326, 332, 336 (1st Cir. 2011). In so holding, the court reasoned that all of the tenants believed that the entire house served as their home, so they could prevent the entry of anyone that they wished to keep out. *Id.* at 336.

Here, the evidence viewed in the light most favorable to Officers Fleming and Lackage (in their favor because Flores is the summary-judgment movant on this claim) shows that Flores had an actual expectation of privacy in the area between the outer

and inner doors. Unlike the common hallway in *Villegas*, Flores's outer door was kept closed until the officers knocked on it. *See* Fleming Dep. 18:9-10; Lackage Dep. 16:21-24. The activities behind that outer door were concealed from the public, showing that, as in *Werra*, Flores believed that he could prevent the entry of anyone that he wished to keep out. Flores also stored personal items in the space between the doors, further suggesting that he viewed that space as private. R. 65 ¶ 32; *cf. United States v. Karo*, 468 U.S. 705, 720 n.6 ("[S]urely [defendants] had a reasonable expectation of privacy in their own storage locker."). Although Fleming and Lackage deny that Flores stored personal belongings in that area, their basis for denial is that the "portion of the record cited by Plaintiff does not support this fact." R. 75 ¶ 32. That specific dispute does not create a genuine issue of material fact; Flores did testify that his family stores personal belongings in dresser drawers in that area. Flores Dep. 150:12-13. Besides contesting Flores's pinpoint record citations, Fleming and Lackage present no evidence to refute these indicia of Flores's actual expectation of privacy. So the Court concludes that a reasonable fact-finder must find that Flores maintained a subjective expectation of privacy in the space between the outer and inner doors of his apartment.

This subjective expectation of privacy was also objectively reasonable. Although "tenants of multifamily dwellings have no legitimate expectation of privacy in common or shared areas," *United States v. Mendoza*, 281 F.3d 712, 715 (7th Cir. 2002), the evidence (even when viewed in the light most favorable to Fleming and Lackage) shows that the area Flores was standing in was *not* a common or shared area. Rather, it was a private area for Flores's family. Fleming and Lackage do not dispute that Flores's

12

apartment was the only apartment behind that outer door. R. 65-6, Pl.'s Exh. E, 4/20/12 Flores Aff. ¶ 7.[6] Nor do they genuinely dispute that Flores's family keeps the outer door locked at all times. Instead, they again only contest whether the cited portion of the record supports that fact, R. 75 ¶ 33; it does, 4/20/12 Flores Aff. ¶ 9. And Fleming and Lackage do not genuinely dispute that the doorframe of Flores's outer door contains only one mailbox and one doorbell, which further shows that the area Flores was standing in belonged only to him and was not a common area. *See* R. 75 ¶¶ 23-24 (denying only that the "outer door is the front door to Flores' apartment"); *cf. Mendoza*, 281 F.3d at 715-16 (no reasonable expectation of privacy in a shared duplex entryway in part because "there remained two mailboxes to [the outer door's] left, [so] there was no signal to the officers that knocking on the outer door would have been necessary").

Lackage and Fleming instead contend that the small area is a common space because "the area has gas meters and people may come to check on the gas when they are not home." R. 75 ¶ 28. It is true that the space does contain gas meters for all of the apartments in Flores's building. R. 75-3, Defs.' Exh. C, Arturo Hinojosa Dep. 45:20-24. But Lackage and Fleming's own evidence about the gas technicians' access to the

---

[6]To the extent that Defendants argue that Flores's two "self-serving" affidavits executed after his deposition may not be considered here, the factual record may include self-serving affidavits as long as they "meet[] the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there was a genuine issue for trial." *Buie v. Quad/Graphics, Inc.* 366 F.3d 496, 504 (7th Cir. 2004) (internal quotation marks and citation omitted). Nor do the affidavits contradict Flores's under-oath testimony, as explained later in the opinion. So Flores's affidavits will be considered.

meters indicates that they ask the Flores family *for permission* to enter to inspect the meters. R. 75-2, Defs.' Exh. B, Evelia Hinojosa Dep. 42:19-20 (testimony of Flores's wife). This fact shows that Flores had the right to exclude others from that space. *See United States v. Duprey*, 895 F.2d 303, 309 (7th Cir. 1989) ("Several [reasonableness] factors have been recognized . . . including . . . whether he has a right to exclude others therefrom." (citation omitted)), *abrogated on other grounds by Gozlon-Peretz v. United States*, 498 U.S. 395, 407-08 (1991). All in all, Flores had an objectively reasonable expectation of privacy in the area he was standing in at the time the arrest began, and no reasonable factfinder could conclude otherwise, even viewing the evidence in the officers' favor.

Apparently conceding as much, Fleming and Lackage mostly respond that Flores renounced any privacy expectation he may have had when he opened his outer door to the police. R. 74, Defs.' Resp. at 5 (citing *United States v. Santana*, 427 U.S. 38 (1976)). In *Santana*, the Supreme Court held that a person who stands in an open doorway *before* the encounter with police begins has no expectation of privacy because she was "as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." 427 U.S. at 42. Here, Flores was not standing in his open doorway before encountering Fleming and Lackage; he opened his door *in response to* Lackage's knock. *See* Lackage Dep. 16:21-24. *Santana* is therefore distinguishable.

This case is instead more similar to *United States v. Berkowitz*, 927 F.2d 1376 (7th Cir. 1991), than it is to *Santana*. In *Berkowitz*, the Seventh Circuit reversed the

14

district court's denial of a motion to suppress and remanded for an evidentiary hearing to resolve a factual dispute: did the defendant answer his door in response to the police's announcing that he was under arrest, or did the police enter the defendant's home *before* announcing the arrest? *Id.* at 1387-88. If it was the former, *Berkowitz* reasoned that "[w]hen the police assert from outside the home their authority to arrest a person, they have not breached the person's privacy interest in the home. If the person recognizes and submits to that authority [by opening the door], the arrestee, in effect, has forfeited the privacy of his home." *Id.* at 1387; *see also Sparing*, 266 F.3d at 690 ("*Berkowitz* only endorsed as reasonable under the Fourth Amendment, a slight entry into the home to complete an arrest announced outside the home when the individual acquiesced to the entry while standing fractions of an inch behind the threshold of her home with the door open."). But if the police enter a home before announcing that the person is under arrest, there is no basis to say, based just on the opening of the door, that the homeowner has submitted to police authority to enter and make the arrest. *Berkowitz*, 927 F.2d at 1388. In so reasoning, the Seventh Circuit distinguished *Santana*: "[T]here is a significant difference between a person who for no reason voluntarily decides to stand in his open doorway, and a person who merely answers a knock on his door." *Id.*

Like the defendant in *Berkowitz*, Flores was at all times inside his home. Although Lackage did not remember if Flores was inside or outside the doorway, Lackage Dep. 18:15-19, even Fleming conceded in his deposition testimony that Flores remained inside the outer doorway. Fleming Dep. 19:5-7. And under *Berkowitz*, a

15

person who "answers the knock and stays *within the house* is not voluntarily exposing himself 'to public view, speech, hearing, and touch as if [he is] standing completely outside [his] house.'" 927 F.3d at 1388 (emphasis added) (quoting *Santana*, 427 U.S. at 42); *see also Sparing*, 266 F.3d at 690 ("Without a warrant, this arrest could only be completed if [Plaintiff] opened his screen door, and *stepped outside of his home* or acquiesced to a slight entry to complete the arrest." (emphasis added)). Under *Berkowitz* and *Sparing*, Flores (who at no point left the confines of his home) did not relinquish his reasonable expectation of privacy simply by answering a knock at his door.

One can argue that *Berkowitz* is not a perfect analogue because Flores opened his door after the police knocked, and even though he opened the door before they announced that he was under arrest, he kept the door open for some time. According to Lackage and Fleming, they did not intend to arrest Flores at the time they knocked on his door.[7] Fleming Dep. 17:5-7; Lackage Dep. 16:21-17:6. Indeed, Fleming testified that he did not tell Flores that he was under arrest until after Fleming went to the sidewalk to ask Burgos (who was standing 25 to 30 feet away) if she wanted Flores arrested. Fleming Dep. 17:21-18:1, 20:10-19. So Flores's door was open to the police for a period of time before Fleming announced that Flores was under arrest. *Berkowitz* did not contemplate these exact facts.

---

[7]Although Flores alleges that Lackage and Fleming tried to handcuff him and pull him outside as soon as he opened the door, Flores Dep. 43:9-12, the Court must credit Defendants' version of the facts solely for the purposes of deciding Flores's motion for partial summary judgment.

But this is not a material distinction. *Berkowitz* suggests that even someone who opens the door in response to the police's knock "has not relinquished his right to close the door on the unwanted visitors." 927 F.3d at 1387; *see also Kentucky v. King*, — U.S. —, 131 S. Ct. 1849, 1862 (2011) ("And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."). This Court need not resolve exactly how quickly a homeowner must shut the door in this situation to preserve his expectation of privacy because, here, there is no evidence suggesting that Flores had any chance at all to close his door before the arrest began.[8] Indeed, both Fleming and Lackage testified that Fleming reached through the open outer doorway once Fleming announced that Flores was under arrest. *See* Fleming Dep. 21:11-15; Lackage Dep. 17:22-18:1. Because Flores did not even have a chance to close the door before Fleming reached into his house to seize him, he had not yet relinquished his reasonable expectation of privacy in the area that the police entered. Absent exigent circumstances, the Defendants' warrantless entry into Flores's home violated the Fourth Amendment.

## 2. Exigent Circumstances

Lackage and Fleming next argue that even if Flores had retained his expectation of privacy at the time of his arrest, they had exigent circumstances to chase him into

---

[8]Defendants have presented no evidence that suggests, for example, that Flores heard Fleming and Burgos confer about placing him under arrest (from 25 to 30 feet away) but did not close his door.

his living room to complete the arrest. Defs.' Resp. at 7. Although exigent circumstances may excuse a warrantless entry of a home, they are "few in number and carefully delineated." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (internal quotation marks and citation omitted). Exigent circumstances exist only when "the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape." *United States v. Diaz*, 814 F.2d 454, 458 (7th Cir. 1987) (internal quotation marks and citation omitted). Indeed, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless . . . arrests." *Welsh*, 466 U.S. at 749-50.

Even viewing the evidence in the officers' favor, there were no exigent circumstances to chase Flores into his home. Flores was charged with misdemeanor assault for his threats to Burgos's car and possibly her person; there was no physical evidence of this offense that Flores was threatening to destroy. R. 65 ¶ 66; *see also* Burgos Dep. 56:17-57:5. Fleming and Lackage instead argue that Flores might have threatened their safety at the moment he fled into the living room. Defs.' Resp. at 7. In support, they point to the following portion of Lackage's deposition testimony:

> Q.    Were you at all concerned about you and your partner's safety for entering—to enter an apartment not knowing what's inside?
>
> A.    I mean, the thing is the guy—the guy we're going to attempt to lock up retreated into his house. Our focus is on him and to his immediate area where he's going to go because we don't know what he's going to do.
>
> Q.    But you don't know what's inside either, right?
>
> A.    That's every day.

18

> Q.   Is there CPD protocol that you're aware of on this issue? Like for example, is that a point where you should call for backup?
>
> A.   No, because anything can happen at that moment. If we let him go any further, who knows. He could have grabbed a gun. We don't know that. It's that instinct. You just go.

Lackage Dep. 59:5-21. But that testimony can only be read as describing the *general* uncertainty that Lackage feels in situations where arrestees flee (especially in the context of calling for backup); it does not speak to, or provide evidence of, Lackage's *specific* fear at that moment that Flores might have been armed with a gun. Indeed, Lackage and Fleming both testified elsewhere in their depositions that, at the moment Flores fled into his living room, they were *not* afraid for their safety or for Burgos's safety. Lackage Dep. 56:18-23, 58:20-24; Fleming Dep. 62:8-63:2. If officers do not need a specific reason to believe that something in the home poses a danger to them, then officers can *always* invoke a fear of what is inside to enter without a warrant. Finally, although Defendants cite *Santana* for the proposition that an arrestee cannot escape an otherwise valid doorway arrest by fleeing into his home, that holding is not applicable here because, as discussed above, there was no valid doorway arrest here. *See* 427 U.S. at 43. It does make perfect sense to allow officers to finish the job and complete a valid doorway arrest by chasing the arrestee inside if he tries to run. But if officers start an invalid doorway arrest, then further Fourth Amendment intrusions into the home cannot be excused by the homeowner's attempt to retreat into the home. Therefore, even after viewing the evidence in the light most favorable to Defendants, Lackage and Fleming did not have exigent circumstances to follow Flores into his

19

living room to complete the arrest. The warrantless entry violated the Fourth Amendment.[9]

### 3. Qualified Immunity

Finally, Lackage and Fleming claim qualified immunity because of the unsettled law regarding doorway arrests. Defs.' Resp. at 8-9. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Although the constitutional right of a person to be free from warrantless entries of their home without consent or exigent circumstances is, as a *general* matter, clearly established, *see Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), determining whether a constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This inquiry requires the Court to assess "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (quoting *Saucier*, 533 U.S. at 202) (internal quotation mark omitted). During this analysis, the Court must view the facts in the light most favorable to Flores because

---

[9]It is worth noting that the damages for the warrantless entry claim are limited to the privacy-intrusion itself, not to any other aspects of harm, for example, the arrest itself (there was probable cause for the arrest, at least when the evidence is viewed in the officers' favor) or the alleged excessive force in effectuating the arrest (that is a separate claim).

the assertion of qualified immunity, although made in a response brief, is really a motion for partial summary judgment in favor of *Defendants*.

Although Defendants argue that *Sparing* granted qualified immunity to a police officer because of the then-unsettled law regarding doorway arrests, this argument misses the mark: *Sparing* (which was decided seven years before Flores's arrest) held that the police officer's warrantless entry was a constitutional violation where the homeowner did not consent, did not subject himself to the arrest by opening the door in response to an announced arrest, and was entirely inside his home. *See* 266 F.3d at 690-91. It therefore *settled* the law regarding those types of doorway arrests. And *Berkowitz*, which as discussed is even more close to the facts of this case than *Sparing* is, was decided in 1991. 927 F.2d at 1376. Thus, in applying the general rule to the specific circumstances that were presented to Fleming and Lackage on December 22, 2008, reasonable officers should have known that an entry into a home without exigent circumstances and an arrest warrant was unreasonable under the Fourth Amendment, when the arrestee was standing at all times within the threshold of an outer door in a small enclosed area that was kept private—as indicated by the single mailbox and doorbell in the outer doorjamb—and was not told he was under arrest before he opened the door. Fleming and Lackage therefore cannot invoke the shield of qualified immunity for the warrantless entry claim. Flores's motion for summary judgment is granted as to that claim.

## B. Excessive Force

Flores also moves for summary judgment as to his excessive force claim. The Fourth Amendment's reasonableness analysis also governs the use of force during arrests. *Graham v. Connor*, 490 U.S. 386, 395 (1989). At the outset, Flores argues that because the warrantless arrest was illegal, any amount of force that the officers used to arrest him was unreasonable. Pl.'s Br. at 11. That is incorrect; *Graham* directs that the Fourth Amendment governs "*all* claims that law enforcement officers have used excessive force," which presumably includes claims where excessive force was used during an illegal arrest. 490 U.S. at 395; *see also Jones v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2006) ("[T]he reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest."). Accordingly, Flores must still prove that there is no genuine issue of material fact as to the unreasonableness of the force used by Lackage and Fleming during the arrest.[10]

The Fourth Amendment's reasonableness analysis of alleged excessive force is fact-specific and depends on the totality of the circumstances surrounding the encounter with the police. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997). In evaluating whether the force used by the police against Flores was excessive, the Court may weigh factors like "the severity of the crime at issue, whether

---

[10]Defendants counter Flores's assertion that Defendants could not have used any force if inside his home unlawfully by pointing out that Illinois law prevents Flores from resisting even an unlawful arrest. Defs.' Resp. at 11. Illinois law is immaterial here because Flores's excessive force claim is governed by federal constitutional law, not state law.

the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation omitted). This inquiry is objective: the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted).

When viewed in the light most favorable to the officers, the force that they used to arrest Flores was not unreasonable. According to the officers, Flores was actively resisting arrest by throwing elbows, refusing to submit to handcuffing, and knocking Fleming to the floor and injuring his wrist. Fleming Dep. 27:5-20; Lackage Dep. 23:14-22. Even after an emergency takedown onto the living room couch, Flores was still struggling and elbowing. Fleming Dep. 31:4-9; Lackage Dep. 24:7-23. It was not until Lackage sprayed Flores with pepper spray (after warning Flores) and struck Flores several times with his open hands that Flores was subdued. Lackage Dep. 25:16-22, 26:5-10, 12-19; Fleming Dep. 32:2-10, 33:14-17, 21-23. If this account is true, the relatively mild severity of the crime Flores was originally charged with (misdemeanor assault, *see* R. 75 ¶ 66) was outweighed by the threat that Flores posed to the safety of the officers and by the violence that Flores was using to actively resist arrest.

In that instance, faced with an escalating situation, Fleming and Lackage were justified in applying the reasonable amount of force that they describe—an emergency takedown, arm bars and wrist locks, open-handed strikes, and pre-warned pepper spraying. *See Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2013) (arm bars and

23

wrist locks were reasonable use of force to subdue a noncompliant subject); *Padula v. Leimbach*, 656 F.3d 595, 603 (7th Cir. 2011) (spraying a physically struggling suspect with mace and "stern[ly]" striking him with a police baton to prevent him from kicking was reasonable (internal quotation marks omitted)); *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("[P]epper spray is a very reasonable alternative to escalating a physical struggle with an arrestee."). *See generally Estate of Phillips*, 123 F.3d at 593 ("Authorities must be allowed to graduate their response to the demands of any particular situation." (internal quotation marks and citation omitted)). Accordingly, when the evidence is viewed in the officers' favor, Flores is not entitled to judgment as a matter of law in his favor.

But the officers also are not entitled to summary judgment. Defendants assert that they are entitled to qualified immunity for the force they used on Flores, and again that is really asking the Court to grant summary judgment to them, Defs.' Resp. at 12, so again the evidence must be viewed in *Flores*'s favor in evaluating the officers' qualified immunity argument. Flores swears that the police were the aggressors from the get-go: they came to his door swearing at him, pulled out handcuffs, and grabbed him to pull him outside. Flores Dep. 41:10-24, 42:1-7, 43:9-16. After he ran away, the police chased him into his living room, beat him on top of the couch (even after he was handcuffed), and sprayed him with pepper spray. *Id.* 46:5-7, 11-13, 47:13-15, 48:7-10, 49:22-50:1. Flores claims that he was only covering his face to protect himself and not throwing elbows or flailing his arms. *Id.* 45:24-46:6. He also denies knocking Fleming

24

to the floor. *Id.* 47:16-18, 47:23-48:1. His account portrays him as, at most, a passive resister.

With the shoe on the other foot and the evidence viewed in the light most favorable to Flores, Lackage and Fleming are not entitled to qualified immunity. Reasonable officers should have known that they were not entitled by the Fourth Amendment to tackle, strike (especially after handcuffing the suspect), and use pepper spray on a person accused of a misdemeanor assault who was not aggressively resisting or fighting back. *See Abbott* v. *Sangamon Cnty., Ill.*, 705 F.3d 706, 732 (7th Cir. 2013) ("Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects." (citations omitted)); *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (use of force in arresting a subject who was not threatening to harm the police officer, not resisting or evading arrest, and was charged with minor offenses was not objectively reasonable); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("It is clear . . . that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever."); *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) (no qualified immunity for striking a handcuffed, passive suspect). Summary judgment in Defendants' favor is therefore denied.

Because the resolution of Flores's excessive force claim boils down to a genuine issue of material fact, namely, whose account of the circumstances of the arrest ought to be believed, neither side is entitled to judgment as a matter of law. A jury, after

assessing the parties' credibility, could reasonably find for either party. Accordingly, Flores's motion for summary judgment on the excessive force claim is denied.

## C. Unconstitutional Conditions of Detention

The City of Chicago also moves for partial summary judgment on Count Three of Flores's Complaint [R. 68], which alleges that Chicago deprived Flores of adequate accommodations for sleep during his one-night stay in the 25th District lockup. Chicago asserts that under the Fourth Amendment, the conditions of Flores's detention were objectively reasonable. R. 70, Defs.' Br. at 2. And even if they were unreasonable, Flores cannot establish municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Defs.' Br. at 4. In response, Flores contends that his overnight detention conditions were unreasonable, and that Chicago maintained policies and customs to not provide overnight arrestees with bedding. R. 71, Pl.'s Resp. at 3-12.

## 1. Conditions of Detention Under the Fourth Amendment

The Fourth Amendment governs the conditions of detention for arrestees from arrest until a probable cause hearing. *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006); *accord Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). Under the Fourth Amendment, an arrestee need only show that the totality of the defendant's conduct in detaining the arrestee was "objectively unreasonable" under the circumstances. *Lopez*, 464 F.3d at 718, 720. This standard is easier for arrestee-plaintiffs to meet than it is for their pretrial-detainee or convicted-prisoner counterparts, whose conditions of detention are governed by the Eighth and Fourteenth Amendments. *Id.* at 718; *Williams*, 509 F.3d at 403 ("[T]he deliberate

26

indifference standard under the Eighth and Fourteenth Amendments requires a higher showing on a plaintiff's part than is necessary to prove an officer's conduct was 'objectively unreasonable under the circumstances.'" (citation omitted)). Here, Flores's claim is for the time he spent in the 25th District lockup after his arrest on the night of December 22, 2008, but before he received his probable cause hearing. Compl. at 7-8. Thus, his claim must be analyzed under the Fourth Amendment.

This Fourth Amendment analysis must account for several factors. In *Lopez*, the arrestee presented evidence that he was "deprived of food, drink, and sleep during the four days and nights he spent shackled to the wall of the interrogation room, and was forced to yell for an extended period of time before being let out to use the bathroom"; the court held that a reasonable jury could find that the detention was objectively unreasonable under the circumstances. 464 F.3d at 720. Other courts have similarly assessed factors like the length of the duration of confinement, the nature and seriousness of the alleged constitutional violation, and the police rationale for the alleged deprivation of the arrestee's constitutional rights. *Cf. Williams*, 509 F.3d at 403 (identifying relevant factors for determining whether the police acted reasonably in ignoring an arrestee's medical needs: whether the officer was given notice, the seriousness of the medical needs, the scope of the requested treatment, and the interests of the police); *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992) ("[T]he cost of confinement to the person confined . . . is smaller the shorter the detention . . . .").

27

Turning to the duration of Flores's confinement, the parties agree that Lackage and Fleming arrested Flores at about 8:20 p.m. that night. R. 80 ¶ 1. After he was brought back to the 25th District station, he was in and out of lockup at various times, but all agree that there was a two-hour window where he was in the upstairs area of the station being interviewed by detectives. R. 72 ¶ 14. The parties dispute exactly what time he arrived at the station that night and what time he left the morning after. Chicago believes he was brought out of his cell at 5 a.m. and taken from the station at 6 a.m., but Flores believes he was brought out at 6 a.m. and driven to the hospital at 7 a.m. R. 72 ¶¶ 18-19. After viewing the facts in the light most favorable to Flores, the Court considers Flores to have been confined in lockup from 9 p.m. to 6 a.m. (from the earliest time he could have been first put in lockup to the latest time he left his cell), minus two hours upstairs.[11] So the duration of Flores's confinement was about seven hours long.

Beyond the duration of his confinement, Flores specifically complains that he was unable to sleep for those seven hours. The parties agree that Flores was not provided with bedding or a mattress to place on top of the concrete block that was in his lockup cell; whether he asked for bedding is disputed. R. 80 ¶ 7. The parties also agree that he did not sleep; instead, they dispute whether he tried to sleep. *Id.* ¶ 8. Chicago maintains that Flores did not even try to sleep, based on its interpretation of his deposition testimony, but Flores submitted an affidavit averring that he was unable

---

[11]By drawing these inferences in Flores's favor, the Court maximizes the amount of time Flores could have spent in lockup (solely for purposes of deciding this motion).

to sleep. *Id.; see also* 5/17/12 Flores Aff ¶ 11 ("I was unable to sleep . . . . The concrete slab was uncomfortable because it was too short and the surface was too hard especially due to the injuries that I suffered during the arrest."). To the extent that Chicago challenges the use of Flores's affidavit to contradict his deposition testimony, there is nothing wrong with so-called "self-serving" affidavits, but an affidavit cannot contradict prior sworn testimony without a plausible explanation. It is true that Flores's deposition testimony on this issue was confusing, but his affidavit arguably does not contradict that deposition testimony. At his deposition, Flores was asked if he tried to sleep in the lockup:

> Q.      Okay. When you were in lockup, did you try to sleep at all?
>
> A.      No.
>
> Q.      You didn't try to sleep?
>
> A.      No.
>
> Q.      Okay. Did you suffer any injuries because you didn't sleep that night?
>
> . . .
>
> A:      What do you mean?
>
> Q.      You said that you weren't able to sleep that night, right?
>
> A.      (Nodding).

Flores Dep. 71:13-72:4. Flores also later answered, "[N]obody sleeps there." *Id.* 72:13. So although he initially denied *trying* to sleep in the lockup, Flores later nodded affirmatively when asked if he was not *able* to sleep. Moreover, he later testified that nobody sleeps in lockup, arguably implying that no one is *able* to sleep in lockup. When

all of these inferences from Flores's deposition are viewed in the light most favorable to him, the portions of his affidavit averring that he was unable to sleep are consistent with his deposition testimony. *See* 5/17/12 Flores Aff. ¶ 11.[12]

Finally, Flores also presented evidence that he was in pain that night and the following morning from the injuries sustained from Fleming and Lackage's alleged beating. Fleming and Lackage testified that Lackage struck Flores multiple times in the back or backside. Fleming Dep. 34:1-10; Lackage Dep. 26:9-10. At Flores's deposition, he appears to have testified that he felt pain overnight:

Q.    You said that you weren't able to sleep that night, right?

A.    (Nodding).

Q.    Did that injure you?

. . .

A:    Yes. Because I was—I was all beat up and then I was locked up and—

Flores Dep. 72:2-10. Again, although Flores's deposition testimony is not crystal clear, after all reasonable inferences are drawn in his favor, Flores appears to have testified that the lack of a place to sleep exacerbated his pain. And Flores's affidavit avers, consistent with this reading of his deposition testimony, that injuries suffered during his arrest (to his back or backside, according to Fleming and Lackage) made sleeping on the hard concrete impossible and caused him physical pain. *See* 5/17/12 Flores Aff.

---

[12]It is also questionable whether Chicago would win summary judgment merely because an arrestee did not *try* to sleep on an obviously (or at least a jury could reasonably find it obvious) uncomfortable concrete block.

¶¶ 11-12. So altogether, Flores has presented evidence that he was unable to sleep for seven hours overnight because he was not given bedding and his back injuries prevented him from sleeping on the hard concrete in his cell.

As a matter of law, it is unclear whether these exact facts, in totality, rise to the level of a Fourth Amendment violation. Chicago argues that they do not, citing to cases from this Circuit that have held that the deprivation of mattresses from pretrial detainees is not a constitutional violation. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) (sleeping on the floor for one night was not unconstitutional); *Montgomery v. O'Grady*, 1991 WL 10891, at *3 (N.D. Ill. Jan. 18, 1991) (sleeping on a mattress on the floor for about three weeks was not unconstitutional). But these cases applied the more demanding (demanding from a plaintiff's perspective) standard under the Eighth and Fourteenth Amendments; they did not apply the Fourth Amendment's more lenient "objective reasonableness" standard. *Antonelli*, 81 F.3d at 1427; *Montgomery*, 1991 WL 10891, at *3. And one cannot logically conclude that the failure to clear a higher hurdle *automatically* means the failure to clear a lower hurdle. So the cases cited by Chicago fail to establish that the deprivation of bedding from arrestees does not violate the Fourth Amendment. Neither do any other cases from this Circuit. *See Stephens v. Cottey*, 145 F. App'x 179, 181 (7th Cir. 2005) (having to sleep for three days on a bedframe without a mattress and five days on a mattress without a bedframe was not an Eighth Amendment violation); *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989) (having to sleep on a slab of metal in wet clothing for two-and-a-half days was not an Eighth Amendment violation); *Atkins v. City of Chicago*, 2009 WL 528472,

31

at *2 (N.D. Ill. Mar. 2, 2009) (dismissing, under the Eighth Amendment, a § 1983 claim by an arrestee who was not provided a mattress for one night in jail).

On the other hand, Flores cites some out-of-circuit cases that have held that the failure to provide bedding to pretrial detainees *does* violate the Fourteenth Amendment's due process clause (which applies to pretrial detainees). Remember, the Fourth Amendment is a more lenient standard for arrestees (before their probable-cause hearing) to meet than is the Fourteenth Amendment for pretrial detainees. So as a matter of logic alone, Flores may directly apply his cases to his facts: all else equal, passing a higher bar automatically means passing a lower one. But everything is not equal—in fact, the circumstances are better for Flores—because Flores's main cases did not involve the fact of (alleged) back injuries. *See Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir. 1989) (no bed or mattress for two nights in county jail violated the Fourteenth Amendment), *overruled on other grounds by Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 981 (9th Cir. 2010); *Anela v. City of Wildwood*, 790 F.2d 1063, 1069 (3d Cir. 1986) (one night's confinement without drinking water, food, or sleeping facilities violated the Fourteenth Amendment); *Ndaula v. Holliday*, 2007 WL 1098954, at *8-9 (W.D. La. Mar. 20, 2007) (genuine issue of material fact existed whether no mattress and no meal for one night plus no bedding for a week violated the Fourteenth Amendment).

Accordingly, Chicago has not shown the objective reasonableness of failing to provide bedding to Flores for seven hours, despite alleged back injuries that prevented Flores from sleeping on hard concrete. Rather, a reasonable jury, after considering the

32

totality of the evidence presented by *both* sides, could go either way. Accordingly, the detention conditions claim survives the Fourth Amendment argument presented in Chicago's motion.[13]

## 2. *Monell* Municipal Liability

But for Flores to prevail against the City of Chicago, it is not enough to survive summary judgment on whether his overnight detention conditions violated the Fourth Amendment. As a municipality, Chicago is liable under § 1983 only for acts that it has officially sanctioned or ordered; Flores cannot rely simply on a *respondeat superior* theory. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986); *Monell*, 436 U.S. at 690-91. He must therefore also show that the deprivation of his Fourth Amendment rights was caused by municipal policy or custom. *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999). Unconstitutional policies or customs can take three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th

---

[13]Flores also argues that the Illinois Municipal Jail and Lock-up Standards provide arrestees with a "substantive right" (presumably meaning a substantive due process right under the Fourteenth Amendment) to mattresses in lockup cells. *See* Pl.'s Resp. at 13-14. Even if the Standards are properly part of the record on summary judgment—which Chicago contests—where the Fourth Amendment provides the appropriate standard for evaluating a claim, district courts need not further analyze the case under the Fourteenth Amendment. *Belcher v. Norton*, 497 F.3d 742, 754 (7th Cir. 2007) (quoting *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994)). The Court therefore declines to resolve Flores's substantive due process argument.

Cir. 2003) (citation omitted). Flores does not allege that a final policymaker caused his injury, so he attempts to prevail under the first two theories (by proving an express policy or a widespread custom or practice).

To do so, Flores relies heavily on the class action litigation in *Dunn v. City of Chicago*, No. 04-cv-06804 (N.D. Ill.). In *Dunn*, a class of persons who had previously been held overnight in lockup cells asserted that Chicago violated their constitutional rights by not providing mattresses or bedding. R. 72 ¶ 12 (Pl.'s Add'l Facts). Flores was a member of the class but he opted out of the eventual settlement. *Id.* ¶¶ 19-20 . Although *Dunn* settled without an admission of liability from the City, *see* R. 72-7, Pl.'s Exh. 6, *Dunn* Final Settlement Approval Order ¶ 6, Flores seeks to replicate the same arguments made there. In particular, he has attached the Illinois Municipal Jail and Lock-up Standards and Chicago Police Department (CPD) General Order 02-03-11 (both were submitted as evidence in *Dunn*) as exhibits to his response brief. *See* R. 72-4, Pl.'s Exh. 3, Illinois Municipal Jail and Lock-up Standards; R. 72-5, Pl.'s Exh. 4, CPD General Order 02-03-11. Flores uses these documents, along with the *Dunn* litigation itself,[14] to make two arguments: (1) because the CPD was required to issue bedding

---

[14]Chicago moved to strike the Illinois Municipal Jail and Lock-up Standards, CPD General Order 02-03-11, and any reference to *Dunn*. R. 80 at 1. As to the two documents, Chicago believes that Federal Rule of Civil Procedure 56(c)(2) bars their consideration at summary judgment. *Id.* ¶¶ 23-24. Under that rule, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), and Chicago contends Flores cannot lay a foundation for these documents. R. 80 ¶¶ 23-24. And Chicago similarly believes that the references to *Dunn* are barred because Flores opted out of the class and cannot now reference *Dunn* for his benefit. R. 79, Defs.' Reply at 10. Flores asserts in response that the two documents fall under the public records hearsay exception, Fed. R. Evid. 803(8), and all references to *Dunn* are merely to prove that Chicago was on notice of the custom of not providing bedding. R. 81, Pl.'s Sur-

34

under the Illinois Lock-up Standards but did not expressly say that it was issuing bedding in its General Order 02-03-11 (which purports to comply with the Standards), CPD (or Chicago) must have had an express policy *not* to issue bedding; and (2) because the *Dunn* litigation itself gave Chicago notice of the (allegedly) unconstitutional practice of not providing bedding to arrestees and Chicago did nothing about it, Chicago must have had a widespread custom or practice to not issue bedding. Pl.'s Resp. at 8-11.

As to the "express policy" prong of § 1983 municipal liability, it is true that any judicial admissions, made in *Dunn*, of an explicit policy to not provide bedding could serve as evidence here. *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996). But Chicago has not admitted that it had an express policy of *not* providing bedding in *Dunn*. For example, in its Answer to the *Dunn* Amended Complaint, Chicago denied the allegation that it maintains "no policy, directive, or procedure requiring the provision of minimally appropriate sleeping accommodations to those in its custody." *Dunn v. City of Chicago*, No. 04-cv-06804, R. 160, Answer to Am. Compl. ¶ 64. More importantly, in Chicago's supplemental response to interrogatories in *Dunn*, it answered, "The City states that it has no such policy" when asked, "Do you have a policy regarding providing a) mattresses/sleeping pads, b) blankets, and/or c) pillows

---

reply ¶¶ 9, 11. The Court need not resolve these threshold issues, because even assuming that Flores's documents and references to *Dunn* are admissible (thus giving him the benefit of the doubt), he cannot show that there is a genuine issue of material fact regarding Chicago's municipal liability, as explained in the text.

to persons held in [CPD] facilities." *Dunn v. City of Chicago*, No. 04-cv-06804, R. 205, Pls.' Exh. 11 ¶ 6.

Nevertheless, Flores contends Chicago did maintain an express policy. According to Flores, the Illinois Municipal Jail and Lock-up Standards required police departments to provide bedding, *see* Illinois Municipal Jail and Lock-up Standards § V(I), but the CPD General Order 02-03-11 that executed the Standards failed to say that CPD would provide bedding. Flores therefore reads these two documents together to draw the negative implication that Chicago has an express policy *not* to provide bedding. Pl.'s Resp. 8-9.

But from these two documents alone—and they comprise the entirety of Flores's evidence of an express policy *not* to act—no reasonable jury could find that Chicago maintained such a policy. Indeed, as the Seventh Circuit as observed:

> No government has, or could have, policies about virtually everything that might happen. The absence of a policy might thus mean only that the government sees no need to address the point at all, or that it believes that case-by-case decisions are best, or that it wants to accumulate some experience before selecting a regular course of action. At times, the absence of a policy might reflect a decision to act unconstitutionally, but the Supreme Court has repeatedly told us to be cautious about drawing that inference. . . .

> [W]hat is needed is *evidence* that there is a true municipal policy at issue, not a random event.

*Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (emphasis added) (citations omitted). This is even more true because the entirety of CPD General Order 02-03-11 appears to require police officers to comply with the *recordkeeping* provisions of the Illinois Municipal Jail and Lock-up Standards; no reasonable jury could draw a

negative implication about a express bedding policy from that order. *See generally* CPD General Order 02-03-11. Based on the factual record before the Court, Flores cannot show that Chicago maintained an express policy to not provide bedding to its overnight arrestees.

Nor can Flores show, on the record evidence in this case, that Chicago maintained a widespread custom or practice of not providing bedding to arrestees. Under this theory of § 1983 municipal liability, Flores may establish a municipal "custom" through proof of the knowledge of policymaking officials and their acquiescence in the established practice. *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993). Thus, in *McNabola*, the Seventh Circuit held that there was sufficient evidence that a reasonable jury could find there was a custom of discriminatory hiring practices by the Chicago Transit Authority (CTA); interrogatory answers and deposition testimony established that new discriminatory hires were recommended to the CTA Board, who made the final decisions to approve them. *Id.* at 512. But even then, the Seventh Circuit acknowledged that the case was "very close." *Id.* at 511.

The evidence that Flores presents here does not make the case nearly as close. Flores points to the bare fact that *Dunn* was filed four years before Flores was ever held in lockup, yet in those intervening four years Chicago did not provide bedding to arrestees. Pl.'s Resp. at 11. Thus, Chicago acquiesced to this practice of not providing bedding to arrestees despite having had notice that this practice was challenged. *Id.* But the only evidence Flores has presented that supports his notice-and-acquiescence

37

theory is *Dunn*'s filing date and his arrest date, without any concrete evidence connecting those two dots. This falls short of even the proof presented in *McNabola*, where the jury heard evidence that the CTA Board *affirmatively approved* of discriminatory hiring. *See* 10 F.3d at 512. And absent this specific evidence of notice and acquiescence—perhaps establishing that policymaking officials knew of the lawsuit, actually considered whether to provide overnight detainees with bedding in the wake of the lawsuit, and then affirmatively chose to continue not providing bedding—no reasonable jury could conclude that Chicago maintained a widespread custom or practice to not provide bedding. *Cf. Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) ("Sheriff Pearce knew that some inmates were not arraigned in the time required by Oregon law, but decided not to create any procedure to remedy the problem. After *several meetings* to discuss the problem, he made the *conscious choice* to continue to do nothing." (emphases added)). In sum, on the factual record before the Court, Flores has not created a genuine issue of material fact that Chicago had an express policy or widespread custom or practice of not providing bedding to Flores. Because Chicago is therefore not liable as a municipality under *Monell*, it is entitled to judgment as a matter of law on Count Three, the detention conditions claim.

## IV. Conclusion

For the reasons stated above, Flores's motion for partial summary judgment [R. 64] is granted in part and denied in part. Summary judgment is granted for Flores's warrantless entry claim but denied for his excessive force claim. The City of Chicago's motion for summary judgment [R. 68] is granted on the detention conditions claim. At

38

the upcoming status hearing on April 11, 2013, the parties should be prepared to address the case schedule moving forward, including whether a settlement conference is sensible.

ENTERED:


      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2013